SUE FAHAMI
Acting United States Attorney
District of Nevada
Nevada Bar No. 5634
ANDREW KEENAN
Assistant United States Attorney
400 South Virginia Street, Suite 900
Reno, Nevada  89501
(775) 784-5438
Andrew.Keenan@usdoj.gov

*Representing the United States of America*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CARLOS RECINOS-VALDEZ,<br><br>and<br><br>KEVIN RECINOS-RUANO,<br><br>Defendants. | Case No: 3:25-mj-00043-CLB<br><br>COMPLAINT FOR VIOLATIONS OF:<br><br>Title 8 U.S.C.§ 1324(a)(1)(A)(v)(I) and (a)(1)(B)(i)—Conspiracy to Harbor Aliens (Count One)<br><br>Title 8 U.S.C. §§ 1324 (a)(1)(A)(iii) and (a)(1)(B)(i)—Harboring Illegal Aliens (Counts Two, Three, and Four)<br><br>Title 18 U.S.C. §§ 1951 and 2— Aiding and Abetting Attempted Interference with Commerce by Extortion (Counts Five and Six) |

BEFORE the Honorable Carla L. Baldwin, United States Magistrate Judge, Reno, Nevada, the undersigned complainant being first duly sworn states:

## COUNT ONE
Conspiracy to Harbor Aliens
(8 U.S.C. §§ 1324 (a)(1)(A)(v)(I) and (a)(1)(B)(i))

1

Beginning on a date unknown but not earlier than July 2021, continuing up to and including March 11, 2025, in the State and Federal District of Nevada, and elsewhere,

**CARLOS RECINOS-VALDEZ,**
and
**KEVIN RECINOS-RUANO,**

defendants herein, combined, conspired, confederated, agreed, and acted interdependently with each other and with other persons whose names are known and unknown to commit an offense defined in 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (a)(1)(B)(i), specifically, harboring illegal aliens, for the purpose of commercial advantage and private financial gain; all in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I) and (a)(1)(B)(i).

COUNT TWO
Harboring Illegal Aliens
(8 U.S.C. §§ 1324 (a)(1)(A)(iii) and (a)(1)(B)(i))

Beginning on or about July 2021, continuing up to and including March 11, 2025, in the State and Federal District of Nevada,

**CARLOS RECINOS-VALDEZ**

defendant herein, knowing and in reckless disregard of the fact that an alien, namely, A.R., had come to, entered and remained in the United States in violation of law, did conceal, harbor, and shield from detection such alien in buildings and other places for the purpose of commercial advantage and private financial gain; all in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iii) and (a)(1)(B)(i).

COUNT THREE
Harboring Illegal Aliens
(8 U.S.C. §§ 1324 (a)(1)(A)(iii) and (a)(1)(B)(i))

Beginning on or about June 2024, continuing up to and including March 11, 2025, in the State and Federal District of Nevada,

**CARLOS RECINOS-VALDEZ**

defendant herein, knowing and in reckless disregard of the fact that an alien, namely, E.G., had come to, entered and remained in the United States in violation of law, did conceal, harbor, and shield from detection such alien in buildings and other places for the purpose of commercial advantage and private financial gain; all in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iii) and (a)(1)(B)(i).

COUNT FOUR
Harboring Illegal Aliens
(8 U.S.C. §§ 1324 (a)(1)(A)(iii) and (a)(1)(B)(i))

Beginning on a date not earlier than February 1, 2024, continuing up to and including March 11, 2025, in the State and Federal District of Nevada,

CARLOS RECINOS-VALDEZ

defendant herein, knowing and in reckless disregard of the fact that an alien, namely, G.J.S., had come to, entered and remained in the United States in violation of law, did conceal, harbor, and shield from detection such alien in buildings and other places for the purpose of commercial advantage and private financial gain; all in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iii) and (a)(1)(B)(i).

COUNT FIVE
Aiding and Abetting Attempted Interference with Commerce by Extortion
(18 U.S.C. §§ 1951 and 2)

On or about February 2, 2025, in the State and Federal District of Nevada,

CARLOS RECINOS-VALDEZ,

defendant herein, aiding and abetting unknown others, unlawfully attempted to obstruct, delay, and affect commerce as that term is defined in Title 18, United States Code, Section 1951(b)(3), and the movement of articles and commodities in such commerce, by extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), in that the

defendant did unlawfully attempt to obtain United States currency, from A.R., by means of

actual and threatened force, violence, and fear of injury to the person of A.R.; all in

violation of Title 18, United States Code, Sections 1951(a) and 2.

<u>COUNT SIX</u>
Aiding and Abetting Attempted Interference with Commerce by Extortion
(18 U.S.C. §§ 1951 and 2)

From a time unknown but not earlier than on or about February 11, 2025, and

continuing up to and including on or about March 11, 2025, in the State and Federal

District of Nevada,

CARLOS RECINOS-VALDEZ,

defendant herein, aiding and abetting others, unlawfully attempted to obstruct, delay, and

affect commerce as that term is defined in Title 18, United States Code, Section 1951(b)(3),

and the movement of articles and commodities in such commerce, by extortion as that

term is defined in Title 18, United States Code, Section 1951(b)(2), in that the defendant

did unlawfully attempt to obtain United States currency, from G.J.S., by means of actual

and threatened force, violence, and fear of injury to the person of D.O.M.A.; all in

violation of Title 18, United States Code, Sections 1951(a) and 2.

Complainant as a Special Agent with the Department of Homeland Security,

Immigration and Customs Enforcement, Homeland Security Investigations states there is

probable cause to arrest the above-named defendants as set forth in the attached affidavit.

/ / /

/ / /

/ / /

/ / /

/ / /

# AFFIDAVIT

I, Shane Lux, Special Agent with Homeland Security Investigations ("HSI"), being duly sworn under penalty of perjury, depose and state:

1. I am an investigative or law enforcement officer of the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for 13 years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

2. I received specialized law enforcement training related to federal law violations of human smuggling and human trafficking during my academy at Federal Law Enforcement Training Center in Glynco, Georgia from February, 2012 to July, 2012. I have received on the job training and experience investigating human smuggling and human trafficking crimes over the last thirteen years as a Special Agent with HSI. Specifically, for the first six years of my Federal Law Enforcement career, my duty station was located at the southern border of the United States where I had routine exposure to alien smuggling and human trafficking investigations

3. While working as a Special Agent, I have been involved in the investigations of various individuals and organizations involved in human smuggling and human trafficking. I have been trained in the preparation of affidavits and have participated the execution of search and arrest warrants for violations of federal and state laws. I am familiar with the

manner in which people are transported, housed, extorted, and victimized; the methods

of payment; the methods of laundering and concealing of smuggling and trafficking

proceeds; and the methods of communication between human smugglers and human

traffickers. I have conducted surveillance operations and have become familiar with the

methods used by individuals engaged in human smuggling and human trafficking.  I

have directed the actions of confidential sources during human smuggling and human

trafficking investigations.  I have also spoken with other investigators, informants,

suspects, and other experienced human smugglers and human traffickers regarding the

methods and practices of human smuggling and human trafficking organizations.  I

have monitored informants' conversations with human smugglers and human

traffickers and have also made myself familiar with trafficking-related conversations.

4. The information contained in this affidavit is based upon my personal observations

and information relayed to me by other law enforcement officers.  Because this

affidavit is being submitted for the limited purpose of establishing probable cause for

the issuance of a criminal complaint, I have not set forth each and every fact I

learned as a result of this investigation.  Rather, I have set forth only those facts I

believe are necessary to establish probable cause that violations of federal law have

been committed.

5. Based on the investigation described in this affidavit, there is probable cause to

believe that Carlos RECINOS-Valdez and Kevin RECINOS-Ruano did commit

offenses which violate federal criminal law, specifically Conspiracy to Harbor Illegal

Aliens in violation of 8 U.S.C. §§ 1324 (a)(1)(A)(v)(I) and (a)(1)(B)(i).

6. Based on the investigation described in this affidavit, there is probable cause to

believe that Carlos RECINOS-Valdez did commit further offenses which violate

1    federal criminal law, specifically Harboring Illegal Aliens, in violation of 8 U.S.C. §§

2    1324 (a)(1)(A)(iii) and (a)(1)(B)(i); and Aiding and Abetting Attempted Interference

3    with Commerce by Extortion, in violation of 18 U.S.C. §§ 1951 and 2.

**PROBABLE CAUSE**

7.   Special Agents/Task Force Officers with HSI are currently investigating a Human
     Trafficking Organization ("HTO") based in Reno, Nevada, led by target suspect
     Carlos RECINOS-Valdez (RECINOS). RECINOS orchestrates the illegal smuggling
     of aliens through a Transnational Criminal Organization ("TCO") with a network of
     human smugglers and traffickers located throughout Guatemala, Mexico, and the
     United States.

8.   HSI received information regarding RECINOS' criminal activities from an HSI
     Confidential Informant (hereinafter referred to as "CI").[1] The CI reported RECINOS
     controls approximately eight (8) locations in trailer parks and apartment complexes,
     commonly referred to as "stash houses," where RECINOS houses illegal aliens. Alien
     smugglers are commonly referred to as "coyotes" and the smuggled aliens are
     commonly known as "pollos." According to the CI, RECINOS and the TCO he works
     for charge up to $25,000 U.S. dollars for each "pollo" he smuggles into the United
     States. According to the CI and victims, once in Reno, Nevada, RECINOS demands
     approximately $500 U.S. dollars every fifteen days from his "pollos" to pay off their
     smuggling debt to the TCO. Subsequently, RECINOS keeps his "pollos" in a debt

---

[1] The CI has been working with law enforcement since January 2025. The information provided by the CI has been established as reliable and corroborated through independent means to include physical surveillance, Border Patrol reports of alien encounters, state/local police reports containing victim testimony and HSI interviews of victims. The CI is not a defendant and is not facing any State/Federal criminal charges. The CI has a criminal history consisting of Domestic Battery and Driving Under the Influence. To date, the CI has not received any compensation in the form of money. The CI is cooperating with law enforcement to receive immigration benefits. No promises or assurances have been made to the CI by the government at this time.

cycle for many years. According to victims, RECINOS does not allow them to leave the Reno area until their debt is paid off. The "pollos" are threatened by RECINOS with physical violence or death if payments are not received. According to victim interviews, it has taken more than two years to pay off debts to RECINOS.

9. Through investigative efforts, victim statements, and statements by the CI, the cellular assigned call number 775-710-8924, has been identified as being used by RECINOS ("TT-1"). On February 4, 2025, I issued a subpoena to AT&T requesting subscriber information for TT-1. AT&T reported Carlos RECINOS as the "Billing Party" with an address of 575 Linden Street Reno, Nevada in the subpoena return for TT-1. Prior to the subpoena issuance, the CI identified the 575 Linden Street apartments as "stash houses" where RECINOS rents several individual apartments to stash his laborers or "pollos." At least one of the victims stated they were harbored by RECINOS at one of the 575 Linden Street stash houses. The CI alleged he observed RECINOS sitting in his white Toyota 4Runner outside of 575 Linden Street apartments on Fridays collecting biweekly debts from a line of illegal alien laborers.

10. Between October and December of 2022, TT-1 had 22 communications with a target of an HSI led narcotics and alien smuggling case in El Paso, Texas.

11. Between October 2022 and March 2023, TT-1 had 102 communications with a target of an HSI led alien smuggling case in Las Cruces, New Mexico.

12. In February 2023, TT-1 had 53 communications with a target of an HSI led alien smuggling case in Alpine, Texas.

13. On April 4, 2023, the U.S. Border Patrol documented TT-1 and cellphone contact name "Carlos" as the smuggler and U.S. point of contact for Victor Daniel MATEO-Chapas, an illegal alien from Guatemala apprehended at the U.S.-Mexico border.

14. On March 3, 2024, the U.S. Border Patrol documented TT-1 and cellphone contact name "Carlos" as the smuggler and U.S. point of contact for Ericka Marisol RAMOS-Castro, an illegal alien from Guatemala apprehended at the U.S.-Mexico border.

15. On September 23, 2024, Border Patrol Agents ("BPA"s) reported they encountered an illegal alien named Dimas ZAPATA-Lima crossing into the U.S. from Mexico. ZAPATA told BPAs he was given a contact in Reno, Nevada, who would coordinate smuggling him into the United States. BPAs reported that the Reno contact was identified by ZAPATA as "Carlos BREDA" with the same telephone number as TT-1. ZAPATA gave BPAs consent to search his phone. The BPAs documented conversations between ZAPATA and TT-1 in which TT-1 instructed ZAPATA when to leave Guatemala and where to illegally cross into the United States. ZAPATA admitted to BPAs he agreed to pay "Carlos BREDA" approximately $8,000 U.S. dollars for his smuggling fees.

16. On February 2, 2025, Reno Police Department ("RPD") responded to a call for service where an assault had occurred. RPD reported encountering two individuals, A.R. (Victim 1) and E.G. (Victim 2) at the residence where the assault took place. Both individuals stated they were illegally smuggled into the United States from Guatemala. According to the RPD report, Victim 1 was called out of the residence by a man identified as "Carlos." Victim 1 stated he and Victim 2 were physically threatened by another unknown male accompanying Carlos. Both victims stated the unidentified male got on the phone and told somebody to bring a gun. Victim 1 stated he was then held down and struck in the face by "Carlos" and the unidentified male. According to Victim 2, "Carlos" had a dispute with Victim 1 about how much money Victim 1 still

owed for his smuggling fee. Victim 1 and Victim 2 identified their attacker in the police report as "Carlos" with a phone number matching TT-1.

17. On February 6, 2025, HSI Special Agent Kristina Lewis and Supervisory Special Agent ("SSA") Jonathan Creiglow consensually encountered Victim 1 and Victim 2 at their residence where the assault took place. The HSI agents identified themselves and conducted an interview of Victim 1 and Victim 2.

18. Victim 1 and Victim 2 stated they were smuggled by "Carlos" or "Don Carlos" and they provided TT-1 as the telephone number belonging to RECINOS. Both Victim 1 and Victim 2 claimed RECINOS coordinated every aspect of their illegal entry into the U.S. from Guatemala. They stated he even picked them up in his car outside of Reno and took them to a stash house. Victim 1 and Victim 2 stated the WhatsApp telephone number they used to communicate with RECINOS was TT-1.

19. Victim 1 and Victim 2 separately identified Carlos RECINOS as their assailant and trafficker in a photographic line-up containing six photographs provided by HSI agents. Additionally, Victim 1 and Victim 2 showed agents RECINOS' Facebook profile photo.

20. According to Victim 1 and Victim 2, RECINOS has multiple accomplices that help him manage his TCO. They claimed RECINOS had a female partner who handles a lot of the logistics for RECINOS. According to Victim 1, the unidentified female has legal immigration status in the U.S. and RECINOS does not. According to Victim 1, the unidentified female made threats to him and was present when RECINOS assaulted him.

21. Victim 1 claimed his smuggling debt was paid off years ago, but RECINOS and his "partners" still wanted more money. Victim 1 stated he has been in the U.S. since

6

2021. Victim 1 stated he and his wife moved to their residence to hide or get away from RECINOS.

22. Victim 2 stated he still owed money to RECINOS for his smuggling debt. Victim 2 told agents that everyone must give RECINOS $500 dollars every 15 days, or every two weeks, to pay for their smuggling fee. SSA Creiglow asked Victim 1 and Victim 2 what would happen if they couldn't pay the $500. Victim 2 stated they had to pay, suggesting there was no other option. Victim 2 stated sometimes they would not have enough money for food after paying RECINOS. Victim 1 told agents he recommended to Victim 2 that he keep a ledger of his payments to avoid problems with RECINOS later.

23. Victim 2 showed special agents a handwritten ledger of his payments to RECINOS. The ledger contained signatures, which Victim 2 identified as belonging to RECINOS. The ledger depicts a written contract, or payment schedule of $500 in one column and to right of that, column with the amounts paid by Victim 1 every two weeks. The contract is dated 5/15/2024 and Victim 2's name is written at the top. To the left of every $500 payment listed in the payment schedule column, "6% interest and capital" is written in the Spanish language. The ledger indicates Victim 2 is rarely able to pay the full $500 to RECINOS, thus compounding payments every two weeks along with 6% interest.

24. Victim 2 explained to agents that his next payment to RECINOS was the following day on February 7, 2025. Victim 2 claimed RECINOS usually sits in his Toyota 4Runner outside a local Mini Mart waiting for his "pollos" to bring payments to him. He stated RECINOS would also show up at Victim 2's residence or place of employment to collect debt. Both Victim 1 and Victim 2 indicated that because of ICE

7

immigration enforcement efforts, RECINOS may have changed tactics or become more vigilant.

25. Towards the end of the interview, Victim 1 admitted that his wife, H.S.R. (Victim 3) and brother, H.E.R (Victim 4), were also smuggled into the United States by RECINOS.

26. Queries of law enforcement databases led to the identification of RECINOS' son, Kevin RECINOS-Ruano (K. RECINOS). K. RECINOS' location is currently being monitored by ICE Enforcement Removal Operations (ERO) stemming from an arrest of K. RECINOS by RPD. ERO placed an ankle monitor on K. RECINOS as an Alternative to Detention ("ATD") based on immigration related matters. K. RECINOS must comply with several conditions set by ERO, to include constant GPS tracking, as part of his ATD. Based in part on K. RECINOS' GPS location, investigators were able to ultimately identify 5707 Jacobson Road Sun Valley, Nevada 89433 as the main residence for RECINOS and K. RECINOS.

27. GPS locations for K. RECINOS' ankle monitor also placed him at three suspected alien stash houses operated by RECINOS between the dates of January 1, 2025, and March 11, 2025.

28. On February 7, 2025, SSA Creiglow received a message from Victim 2 stating RECINOS was meeting him at his place of employment to collect debt that evening. Victim 2 stated previously that RECINOS communicates with him and other "Pollos" via WhatsApp using TT-1. Victim 2 provided his location at work. Shortly after receiving that information, HSI Task Force Officer Tallman observed RECINOS depart from one of his suspected residences in his white Toyota 4Runner bearing Nevada license plate number 842ZXN. Victim 2 stated they would be meeting

RECINOS in the parking lot of his employment location. I observed RECINOS drive to the back parking lot of Victim 2's employment location. Shortly after, Victim 2 advised SSA Creiglow that he had paid RECINOS. SSA Creiglow asked Victim 2 how much he paid RECINOS. Victim 2 stated he only paid $400, because he had previously given RECINOS an additional $100 on top of his normal $500 required payment.

29. Approximately one hour after Victim 2 paid RECINOS, RECINOS' white Toyota 4Runner was captured on HSI video surveillance arriving at the 575 Linden Street apartment parking lot. I observed a male exit the White Toyota 4Runner wearing the same color clothing as RECINOS was wearing an hour earlier when he collected payment from Victim 2. A hand-to-hand exchange took place with an unidentified male at the apartment complex before RECINOS returned to his vehicle and drove away. Based on my training and experience, and knowledge of this investigation, this hand-to-hand exchange appeared consistent with a "coyote" meeting with a "pollo" to collect debt.

30. On February 12, 2025, I conducted an interview of Victim 4. Victim 4 identified RECINOS from a photographic line-up containing six photographs as the person who coordinated his illegal entry into the U.S. from Guatemala. Victim 4 stated he had been present in the U.S. for approximately three (3) years and claimed he was finished paying his debt to RECINOS. Victim 4 stated he and other "pollos" were not allowed to move or leave Reno, Nevada, until they had paid all their debt to RECINOS. Victim 4 stated RECINOS had previously made threats of violence when Victim 4 couldn't make scheduled payments.

31. I spoke again to Victim 1 at the conclusion of Victim 4's interview. Victim 1 expressed fear that RECINOS could potentially harm him again or his family members living in

9

Guatemala. Victim 1 stated his family is from a small town and RECINOS knows where they live. Victim 1 described RECINOS as a dangerous person.

32. On February 27, 2025, SA Lewis and I met with Victim 1, Victim 2, Victim 3, and Victim 4. All four victims identified TT-1 as the number belonging to RECINOS. Special Agent Lewis requested to see the WhatsApp messages between RECINOS and Victim 2. SA Lewis observed Spanish communication between Victim 2 and TT-1, discussing payments and dates for meetings. In addition, SA Lewis observed photographs sent by RECINOS to Victim 2 depicting payment ledgers. Victim 3 shared a video from the home surveillance system installed at their residence following the assault on Victim 1. Three men approached Victims 1-4's residence on foot before suddenly stopping when a motion light activated. One of the men peered through the gate before all three departed. Victim 3 stated the three men were "enforcers" for RECINOS. Victim 3 stated the male that looked through the gate in the video was present on February 2, 2025, and participated in the assault of Victim 1. Victim 3 stated she is afraid to be in her home because RECINOS was able to find their new residence and his "enforcers" are actively watching and intimidating them.

33. On March 7, 2025, Victim 2 notified me that RECINOS had contacted him using TT-1 about an upcoming payment. Victim 2 stated he was instructed by RECINOS to meet at a local supermarket named, "El Super." I provided Victim 2 with an audio and video recording device. Victim 2 told me that he called TT-1 and notified RECINOS of his arrival at El Super. I then observed via video surveillance the 4Runner leave 5707 Jacobson Road Sun Valley, Nevada 89433. Approximately 20 minutes later, I observed RECINOS arriving at El Super driving the 4Runner bearing Nevada license plate 842ZXN. I then observed Victim 2 make contact and enter

RECINOS' 4Runner. Moments later, Victim 2 exited RECINOS' vehicle and contacted me. Victim 2 told me he paid RECINOS $500. The incident was audio and video recorded. Victim 2 told me that RECINOS would likely send him a text using TT-1, confirming his payment. Just following the payment, Victim 2 texted TT-1 to confirm Victim 2 had now made 18 payments. RECINOS responded back from TT-1, "Thank you."

34. On March 7, 2025, the HSI CI notified me about an undocumented alien living in Reno whose wife is being held for ransom at stash house on the U.S.-Mexico border by RECINOS.

35. On March 10, 2025, the CI assisted SA Lewis and me with locating the individual, later identified as G.J.S. (Victim 5), outside his residence. Victim 5 admitted to being a Guatemalan citizen present in the U.S. without legal immigration documents. SSA Creiglow and I transported Victim 5 to a nearby HSI office. Victim 5 agreed to a recorded interview. ICE Enforcement and Removal Officer Deportation Officer ("DO") Esmeralda Aparicio, assisted with Spanish translation.

36. According to Victim 5, he was smuggled into the U.S. with the assistance of RECINOS approximately one (1) year ago. Victim 5 identified TT-1 in his cellphone to me as the number used to communicate with RECINOS. Victim 5 stated RECINOS made him pay $1,000 every two (2) weeks until his debt was paid off.

37. Victim 5 stated that approximately two (2) weeks ago, he paid RECINOS $10,000 USD to smuggle his wife, D.O.M.A. (Victim 6), from Guatemala to Reno, NV. Victim 5 stated his wife was successfully smuggled into the U.S. over one (1) week ago. Upon Victim 6's arrival to a stash house in an unknown location in Houston, TX, the smugglers took her phone away and demanded more money. Victim 5 stated he called

11

RECINOS who stated it wasn't his problem anymore. Victim 5 told me that unidentified smugglers using telephone numbers from Guatemala and Texas demanded $3,000 USD be wired to an account before they would transport Victim 6 to Reno. Victim 5 claimed they threatened to hurt or kill Victim 6 if he could not pay. Victim 5 told investigators that he did not have any more money after paying RECINOS. Victim 5 stated he had not spoken to his wife in over two (2) days.

38. SSA Creiglow and I asked Victim 5 if he could call the suspected stash house caretaker to verify the ransom amount and account number, and to verify the wellbeing of Victim 6. I recorded the telephone call made by Victim 5 to the stash house caretaker. The suspected stash house caretaker answered the phone, and he told Victim 5 it had been a long time and that he needed to wire money today. Victim 5 requested more time and asked if he could speak with Victim 6. Shortly after, Victim 5's wife began talking on the phone asking why he hadn't been able to come up with the money. Victim 5 assured his wife he would come up with the money, and the phone conversation ended.

39. While transporting Victim 5 back to his residence, he notified SSA Creiglow and me that he was receiving a call on WhatsApp from one of the smugglers from Guatemala. Victim 5 answered the phone, and the smuggler stated, "I'm told you don't want to pay and it's okay to kill your wife?" Victim 5 responded by telling the smuggler he would have the money in a couple days. The smuggler told Victim 5 he needed to hurry up and then hung up the phone.

40. Shortly after, Victim 5 notified SSA Creiglow and I that he was receiving a three-way call on WhatsApp from Victim 6's smugglers. Victim 5 answered the phone, and the smugglers began demanding the money, claiming bad things would happen to Victim

6 if he didn't pay. I began recording the conversation. Victim 5 told the smugglers he had already paid $10,000 USD RECINOS to get Victim 6 to Reno and that the rest was supposed to be payments. The smugglers threatened to hurt Victim 6 and use her as a prostitute if they did not receive payments in the next two (2) days. The smugglers told Victim 5 he had two days to pay.

41. On March 11, 2025, investigative efforts and coordination between HSI Reno and HSI Houston led the rescue of Victim 6 from the stash house in Houston, Texas. An additional 2 male victims were also being held by the stash house caretaker. Victim 6 stated she was locked in a closet with the two male victims for eight days and only let out to use the bathroom or cook for everyone in the stash house. Victim 6 stated she overheard the stash house caretaker threaten Victim 5 over the phone that they would kill and dismember her and send her body parts back to her family in Guatemala. Victim 6 stated she was scared the entire eight days and thought she was going to die.

42. On March 12, 2025, Victim 5 consensually shared his text message conversations via WhatsApp with RECINOS on TT-1 with me. The following are draft translations by Spanish speaking HSI Special Agents:

**2/11/2025**

Victim 5:     As we had said, when she's in Alburquerque I'll pay you 2,000 but [U/I]

RECINOS:   No you get the money ready

                    When she's in Houston there [she/you] pays

Victim 5:     But how much

RECINOS:   Start getting the money ready

                    There might be [interest?]

                    Days

13

| | | |
|---|---|---|
| 1 | | Or before |
| 2 | Victim 5: | But the 2,000 |
| 3 | | [U/I] don't have it |
| 4 | | [U/I] |
| 5 | | We didn't stick to the deal that [U/I] |
| 6 | RECINOS: | But we had a deal that you were going to give 2,000 and look how much |
| 7 | | time has passed and you still haven't put it together |
| 8 | | Then like that it can't be done |
| 9 | Victim 5: | If she come to pass I give [them/you?] [U/I] |
| 10 | RECINOS: | No that's not with me |
| 11 | | It's with them |
| 12 | Victim 5: | When she hits Houston I give you 2,000 [U/I] |
| 13 | RECINOS: | The deal |
| 14 | | **2/13/25** |
| 15 | RECINOS: | What time will you make the deposit |
| 16 | | [Forwarded text with bank account information. The account holder is |
| 17 | | Pablo Ariel Benavides Reyna with Banco Azteca] |
| 18 | | [Forwarded text with photo of a Banco Azteca Visa card] |
| 19 | | In this 500 |
| 20 | | [Forwarded text: More bank account information] |
| 21 | Victim 5: | They haven't left Mexico |
| 22 | | [Some missed calls back and forth] |
| 23 | Victim 5: | I already put [U/I] |
| 24 | RECINOS: | Send me the receipts |

14

Victim 5:    [Photos of two receipts sent]

I'm still waiting on 300 tomorrow that I'll get from my restaurant check

**2/25/2025**

Victim 5:    Mr. Carlos do what you can I will pay you the rest or tell Mr. Mario that I will make payments see that this doesn't go bad I am will to pay whatever to you tell me to in payments

RECINOS:    I can't

I don't have the money

And they might be lying about being in Houston from what number did your wife call you

43. On March 6, 2025, HSI Reno established continuous video surveillance of 5707 Jacobson Road Sun Valley, Nevada 89433. Between March 6, 2025, to present, HSI SAs have observed RECINOS at 5707 Jacobson Road Sun Valley, Nevada 89433 daily. HSI SAs have observed RECINOS' white 4Runner bearing license plate number 842ZXN consistently parked at 5707 Jacobson Road Sun Valley, Nevada 89433 overnight.

44. On March 10, 2025, SA Lux applied for and was granted a federal GPS location warrant for TT-1. Between March 10, 2025, to present, HSI SAs have observed TT-1 GPS locations at 5707 Jacobson Road Sun Valley, Nevada 89433 daily. Additionally, HSI SAs have observed the GPS locations of TT-1 are consistently in the same location as RECINOS' white 4Runner. Based on my training and experience, I believe 5707 Jacobson Road Sun Valley, Nevada 89433 is the primary residence for RECINOS.

45. K. RECINOS' GPS ankle monitor place K. RECINOS primarily at 5707 Jacobson Road Sun Valley, Nevada 89433, to include overnight. Additionally, K. RECINOS'

15

registered address with ERO as a condition of his ATD is listed as 5707 Jacobson Road Sun Valley, Nevada 89433. Based on my training and experience, I believe 5707 Jacobson Road Sun Valley, Nevada 89433 is the primary residence for K. RECINOS.

46. On March 12, 2025, SSA Creiglow and Drug Enforcement Administration ("DEA") SA Diego Ruiz met with Victim 5. Victim 5 was shown a photographic line-up containing six photographs. Victim 5 positively identified K. RECINOS and stated K. RECINOS collects debt payments from illegal aliens on behalf of RECINOS. Victim 5 further stated that K. RECINOS threatens and intimidates illegal aliens and is known to carry firearms.

47. On March 13, 2025, HSI SAs met with Victims 1-4. Each Victim was separately shown a photographic line-up containing six photographs. Victim 1, 3, and 4 positively identified K. RECINOS as RECINOS' son. Victims 1, 3, and 4 stated K. RECINOS has collected debt payments on behalf of RECINOS. Additionally, Victim 1 stated that K. RECINOS helps to run RECINOS' HTO and is "trouble." Victim 1 stated K. RECINOS acts as an enforcer on RECINOS' behalf and has threatened other aliens if debt is not paid.

## CONCLUSION

48. Based on the foregoing facts and evidence, I believe that probable cause exists to believe Carlos RECINOS-Valdez and Kevin RECINOS-Ruano did commit offenses which violate federal criminal law, specifically Conspiracy to Harbor Illegal Aliens in violation of 8 U.S.C. §§ 1324 (a)(1)(A)(v)(I) and (a)(1)(B)(i).

49. Based on the foregoing facts and evidence, I believe that probable cause exists to believe Carlos RECINOS-Valdez did commit further offenses which violate federal criminal law, specifically Harboring Illegal Aliens, in violation of 8 U.S.C. §§ 1324

16

(a)(1)(A)(iii) and (a)(1)(B)(i); and Aiding and Abetting Attempted Interference with Commerce by Extortion, in violation of 18 U.S.C. §§ 1951 and 2.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Respectfully submitted,

Shane Lux – Special Agent
Homeland Security Investigations

SUBSCRIBED AND SWORN TO BEFORE ME
on this 14th day of March, 2025.

HON. CARLA L. BALDWIN
UNITED STATES MAGISTRATE JUDGE

17